## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**ANGELA M. BLYTHE,**

    **Petitioner,**

      **v.**

**UNITED STATES OF AMERICA,**

    **Respondent.**

**Criminal No. JKB-14-591**
**Civil No. JKB-17-1756**

### MEMORANDUM

Angela Mae Blythe, now known as Angela Mae Liller ("Petitioner"), moves the Court to vacate her sentence under 28 U.S.C. § 2255 ("Motion"). (ECF No. 124.) The United States of America ("Government") opposed the Motion (ECF No. 140), and Petitioner replied (ECF No. 142). Both parties have filed supplemental materials with the Court. (ECF Nos. 152, 156.) No hearing is required. *See* Local Rules 105.6, 207 (D. Md. 2021). For the following reasons, Petitioner's Motion will be DENIED. The evidentiary hearing scheduled for March 21 and March 22, 2023 (ECF No. 177) will be CANCELED.

### I.   *Background*

Petitioner was a settlement attorney in Garrett County, Maryland. Generally, settlement attorneys oversee the closing services needed to complete the sale or purchase of real estate. Petitioner's duties were no different. As an agent of Chicago Title Insurance Company, she was responsible for preparing a "Form HUD-1" to confirm the final accounting of each transaction that she handled. (Trial Tr. vol. II, ECF No. 113 at 327:24–328:9.) In other words, a Form HUD-1 memorializes the amount—and source—of money put toward settling a real estate deal. The

accuracy of this information is vital.  When Petitioner signed this type of form, she affirmed it was a true and accurate representation of the transaction.  (*Id.* at 329:3–6.)  Before finalizing a settlement, she would also issue a "title commitment binder."  Preparing these binders required Petitioner to verify the "identity, legal age, competency, and marital status of all parties to [each] transaction."  (*Id.* at 190:20–21.)

Petitioner was charged with bank fraud and other federal offenses[1] for her role in facilitating fraudulent real estate transactions for a certain Samuel VanSickle.  (Indictment, ECF No. 1.)  The documents memorializing the transactions at issue indicated that Mr. VanSickle bought property from either "Donald Blunt, Trustee for Gospel Church," or "Donald Blunt, Trustee for Freedom Church."  (Trial Tr. vol. V, ECF No. 116 at 985:16–988:17.)  Although she was required to verify the identities of all parties to these real estate settlements, Petitioner admitted in a civil deposition that she had never met Donald Blunt.  In fact, Donald Blunt did not exist. (Trial Tr. vol. I, ECF No. 112 at 66:13–18.)  Mr. VanSickle had previously transferred titles for those same properties from his (real) name to the fictitious Donald Blunt for nominal consideration.  (Trial Tr. vol. V, ECF No. 116 at 985:16–986:7.)  The scheme allowed Mr. VanSickle to take out mortgages on property he was essentially selling to himself.  In doing so, he raised capital he otherwise may not have been able to access.

Andrew C. White, William N. Sinclair, and Andrew G.W. Norman represented Petitioner in these proceedings.  (ECF Nos. 6, 7, 19.)[2]  At trial, the Government introduced evidence that

---

[1] Specifically, Petitioner was charged with: (1) conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 (Count One); (2) bank fraud in violation of 18 U.S.C. § 1344 (Count Two); and (3) making false statements to banks in violation of 18 U.S.C. § 1014 (Counts Three and Four). (Jury Verdict, ECF No. 72.)

[2] Petitioner was initially represented by Robert Bonsib. (ECF No. 5.)  Mr. Bonsib later withdrew his appearance. (ECF Nos. 14, 15.)

2

Petitioner was a conscious participant in VanSickle's plot.  In transactions with legitimate third parties, Petitioner would include driver's license photos from all parties in the settlement files that she prepared.  (Trial Tr. vol. IV, ECF No. 115 at 823:3–25.)  But Petitioner included no such identification in transactions with VanSickle's aliases.  In fact, none of Petitioner's settlement files provided a birth date for Donald Blunt.  (Trial Tr. vol. V, ECF No. 116 at 927:9–11.)  Nor did Petitioner use a real Social Security Number for Mr. Blunt in any of her files.  (*Id.* at 927:12–23.)

The Government provided significant evidence that Petitioner must have known that "Donald Blunt" was an alias for VanSickle.  In some settlements, Donald Blunt would appear as a trustee for "Freedom Church"; for other transactions, he was a trustee for "Gospel Church."  But those who had spent their entire lives in Garrett County had never heard of those churches operating in the area.  (Trial Tr. vol. I, ECF No. 112 at 91:24–92:2.)

Petitioner knew VanSickle's address was Post Office Box 156 in Accident, Maryland 21520.  Prior to the property transactions at issue, Petitioner had defended VanSickle in a deposition where he identified that address as his own (Gov't Tr. Ex. 2c), and Petitioner sent her billing invoices to VanSickle at that address for years. (Gov't Tr. Ex. 22f.)  However, Petitioner would *also* list that same address for "Gospel Church." (Trial Tr. vol. I, ECF No. 112 at 453:19–454:6.)  In other settlements, Petitioner used that address for VanSickle while "Gospel Church" used the address of Lou Strosnider, a co-conspirator of VanSickle's.  In response to a subpoena, Petitioner turned over her office's billing records. Petitioner never billed "Donald Blunt," "Gospel Church," "Freedom Church," or any of VanSickle's aliases.  (Trial Tr. vol. V, ECF No. 116 at 942:2–8.)

The Government introduced evidence suggesting Petitioner knew VanSickle used various aliases in his real estate dealings.  Petitioner had previously represented VanSickle in a 1998 civil

3

fraud case alleging VanSickle had defrauded a grantee who purchased land from him in Garrett County, Maryland. (Trial Tr. vol. II, ECF No. 113 at 339:8–11.) During a deposition in that case, VanSickle testified that he preferred not to hold property in his own name. VanSickle explained that he did not want people to be able to see his land transactions by looking at property tax records.

After a nine-day jury trial, Petitioner was convicted on all counts. (Jury Verdict, ECF No. 72.) On December 16, 2015, U.S. District Judge William D. Quarles sentenced Petitioner to a term of imprisonment of a year and a day for each count with each term running concurrently. (Judgment, ECF No. 95.) Judge Quarles also required Petitioner to complete three years of supervised release and pay restitution and forfeiture. (*Id.*) Petitioner filed a timely appeal to the United States Court of Appeals for the Fourth Circuit. (ECF No. 97.) On July 13, 2016, the Fourth Circuit affirmed each of Petitioner's convictions in an unpublished per curiam opinion. *United States v. Blythe*, 654 F. App'x 618 (4th Cir. 2016). On June 26, 2017, Petitioner filed this Motion under 28 U.S.C. § 2255. (ECF No. 124.)

## II.    *Legal Standard*

Section 2255 allows a federal prisoner[3] to move to set aside a sentence on the ground "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. When considering a § 2255 motion, the court must hold a hearing unless the record "conclusively show[s] that the prisoner is entitled to no relief[.]" *Id.* § 2255(b). To the extent the court "denies § 2255

---

[3] Petitioner's release from prison does not moot her Motion. *See Leonard v. Hammond*, 804 F.2d 838, 842 (4th Cir. 1986) (citing *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968)) ("Plaintiffs' subsequent releases have no effect on that jurisdiction. [O]nce the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application.") (internal quotation marks omitted).

relief without an evidentiary hearing, the nature of the court's ruling is akin to a ruling on a motion for summary judgment, and the facts must be considered in the light most favorable to the § 2255 movant." *United States v. Nguyen*, 789 F. App'x 965, 966 (4th Cir. 2020) (internal quotation marks omitted) (citing *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007)).

## III.   *Analysis*

### A. *Ineffective Assistance of Counsel*

Petitioner raises twenty-five grounds for relief based on ineffective assistance of counsel. (Mot., ECF No. 124.)  To prevail on an ineffective assistance of counsel claim, Petitioner must show: (1) her trial counsel's performance was deficient, and (2) that the deficiency prejudiced Petitioner's defense. *See Strickland v. Washington*, 466 U.S. 668, 688–94 (1984).   Under *Strickland*'s "performance" prong, Petitioner must show her "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  To satisfy *Strickland*'s "prejudice" prong, Petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  The Court need not analyze both prongs if a petitioner makes an insufficient showing on one. *See Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015) (citing *Strickland*, 466 U.S. at 697).  A lawyer's performance is entitled to a "strong presumption" of reasonableness under these inquiries. *See Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quoting *Strickland*, 466 U.S. at 690).  Ultimately, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

Each issue raised by Petitioner falls under one of nine general categories.  The court will address each in turn.

### 1. *Failure to Call Expert Witnesses (Grounds 1–5, 7–8, 24)*

Petitioner claims her counsel should have called expert witnesses to explain various real estate transactions, privacy concerns with purchasing property, the role of a notary public, and basic real property law. But the lack of defense experts at her trial does not mean Petitioner received objectively unreasonable representation. *Strickland*'s presumption of reasonableness is "particularly difficult to overcome" in a claim of ineffectiveness for failing to call an expert witness. *McQueen v. United States*, No. 5:09-CR-00253-F-1, 2016 WL 413090, at *9 (E.D.N.C. Feb. 2, 2016) (citing *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004)). Indeed, decisions about "which witnesses to call is a classic tactical decision left to counsel." *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010).[4]

Here, Petitioner's counsel made a reasonable tactical decision in declining to call expert witnesses. Petitioner and her counsel discussed the risks and benefits of putting an expert on the stand. After consulting three potential experts, Petitioner's counsel concluded that calling any sort of real estate expert "would have allowed the Government on cross-examination to highlight the serious shortcomings of [Petitioner's] office practices." (Tr. Att'y Aff., ECF No. 137 ¶ 5.) That cost-benefit assessment of Petitioner's case reflects reasonable and competent representation. *See Terry*, 366 F.3d at 317 ("[T]he decision of whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which [courts] must afford enormous . . . deference.") (internal punctuation omitted); *see also Harrington*, 562 U.S. at 108 (explaining that an attorney need not deploy a strategy that "might be harmful to the defense").

---

[4] In any event, the record reflects that Petitioner was intimately involved in the decision about whether to call expert witnesses. After reviewing her counsel's analysis, Petitioner expressly deferred to their judgment on the issue. (ECF No. 139 at 22.)

Because there are "countless ways to provide effective assistance in any given case," courts must not limit counsel to "any one technique or approach." *See Harrington*, 562 U.S. at 106–07 (explaining defense counsel could reasonably decline to use experts in some cases). Indeed, in cross-examining certain Government witnesses, Petitioner's trial counsel elicited the same testimony that Petitioner claims she needed from expert witnesses. For example, Petitioner argues her lawyers should have called an expert to "explain the difference between a '1031 Exchange' and a 'mortgage payoff'." (Mot., ECF No. 124 at 10.) But Jodie Hughes, a Government witness employed by BB&T Bank ("BB&T"), explained that distinction under cross-examination. (Trial Tr. vol. II, ECF No. 113 at 339:8–11 ("Oh. I believe they're probably referring to a 1031 exchange, whereby the seller had sold the previous property and were using the profits from that property or the proceeds from that property for this property.").) And Ms. Hughes specifically defined 1031 Exchanges and how they work compared to other transactions. (*Id.* at 348:11–20, 352:16–20, 377:4–13, 378:9–23.) So, introducing expert testimony on this issue would have been redundant at best.

Petitioner also claims her attorneys should have called an expert to testify about "BB&T's negligence" in making and underwriting some of the loans at issue. (Mot., ECF No. 124 at 16–22.) But Petitioner's counsel cross-examined multiple BB&T officers about the relevant loans. In doing so, Petitioner's counsel elicited testimony about BB&T's lack of diligence surrounding the transactions. (Trial Tr. vol. II, ECF No. 113 at 352:21–353:7, 363:3–18, 364:1–366:10.) The fact that Petitioner's counsel could have presented expert testimony *in addition to* cross-examining the Government's witnesses is irrelevant. *See Moore v. Hardee*, 723 F.3d 488, 498 (4th Cir. 2013) (quoting *Winston v. Kelly*, 592 F.3d 535, 544 (4th Cir. 2010)) ("The fact that counsel's cross-examination could have been presented *along with* expert testimony on eyewitness identification

7

must not be analyzed 'through the distorting effects of hindsight.'") (emphasis added). Petitioner's counsel made a strategic choice to avoid using expert witnesses at trial. Complex cases demand difficult judgment calls. Petitioner's challenge suffers from the "distorting effects of hindsight," *id.*, which cannot provide grounds for relief.

Petitioner fares no better in satisfying *Strickland*'s "prejudice" prong because she has not shown how any expert witness could have exonerated her at trial. Petitioner suggests an expert would have explained various real estate concepts to the jury, but explanations do not guarantee exonerations. Take Petitioner's claim that she was owed expert testimony on the role of a notary public. A notaries expert could have "explain[ed] why documents are notarized" to show Petitioner reasonably relied on the fact that other notaries had signed off on certain fraudulent documents. (Mot., ECF No. 124 at 9.) And to Petitioner's credit, that expert might have testified that "lawyers routinely accept [a notary's] verification on [a] deed and affidavits to confirm the settlement sheet signature." (*Id.*) Yet that same expert could have given damning testimony against Petitioner. As Petitioner's counsel predicted, the Government was ready to cross-examine any such expert with a copy of the "Handbook of Maryland Notaries Public." (Opp'n, ECF No. 140 at 20; Tr. Att'y Aff., ECF No. 137 at ¶ 7.) Given Petitioner's haphazard adherence to the handbook's guidelines, an expert may have emphasized Petitioner's inadequate office practices under cross-examination. In this case, the Government put Petitioner's intent under a microscope, so any evidence about Petitioner's professional missteps could have helped the jury reach a guilty verdict.

Although testimony from an expert witness may have been helpful for the jury, no evidence suggests the complexity of the case resulted in Petitioner's conviction. While deliberating, the jury sent a note asking the court to explain the obligations of a settlement attorney in a "mail-

away" transaction. (Trial Tr. vol. VIII, ECF No. 119 at 1452:8–11.) Petitioner claims she faced

prejudice because she lacked "an expert witness to explain the process of a 'mail away' closing."

(Mot., ECF No. 124 at 8.) "If an expert witness had been called to explain "mail-away closing[s],"

Petitioner claims she "would not have been convicted." (*Id.*) But Petitioner's argument is far too

conclusory; *Strickland* demands more. *See United States v. Terry*, 366 F.3d 312, 316 (4th Cir.

2004) ("[C]onclusory allegations are insufficient to establish the requisite prejudice under

*Strickland*."). No causal connection exists between the jury's definitional inquiry and Petitioner's

conviction. Indeed, confusion about the inner workings of the relevant transactions may have just

as easily benefited Petitioner. The jury's uncertainty could have supported Petitioner's argument

that her involvement in the scheme was merely incidental given the fast-paced and complex nature

of real estate transactions.

In sum, the Court will deny Petitioner's ineffective assistance of counsel claims concerning

her lack of expert witnesses at trial. (Mot., ECF No. 124 at 5–12, 14–21.)[5]

### 2. *Advisement of Right to Testify (Grounds 6, 21)*

Petitioner also claims her lawyers did not properly advise her of her right to testify at trial.

(Mot., ECF No. 124 at 13–14.) To support her claim, Petitioner contends she never received a

copy of Judge Quarles's Memorandum Opinion issued on September 29, 2015. In that decision,

---

[5] Petitioner argues in Ground 24 that: "Defense counsel failed to present or explain the law about:
(1) attorney certifications on deeds, (2) the notary public's purpose and duties, (3) 1031 exchanges,
(4) IRS 1099 filings which attorneys are required to file with the IRS to report real property
conveyances, (5) Maryland real property intake sheets, and (6) conveyance types identified on
Maryland Real Property Intake Sheets." (Mot., ECF No. 124 at 42.) The Court construes this as
an argument that Petitioner was owed an expert witness to help explain these areas of law. To the
extent Petitioner critiques the law "presented" to the jury, that argument more appropriately targets
the jury instructions used to convict her. But the Fourth Circuit already affirmed the merits of
Petitioner's conviction on direct appeal, so Petitioner cannot question the propriety of her jury
instructions in this collateral attack.

Judge Quarles noted the case could "turn on whether [Petitioner] had the requisite *mens rea*." (Mem. Op., ECF No. 55 at 14–15.) Because Petitioner never received a copy of that decision, she argues she "did not know her state of mind was such an important issue." (Mot., ECF No. 124 at 14.) Petitioner claims she would have testified had she seen the decision. And if Petitioner had testified, she claims she would not have been convicted.

Petitioner's argument lacks merit. The Court need not resolve whether Petitioner, in fact, received a copy of Judge Quarles's decision.[6] The Fourth Circuit has "clearly held that to waive the right to testify, all the defendant needs to know is that a right to testify exists." *United States v. Sharp*, 400 F. App'x 741, 748 (4th Cir. 2010) (quoting *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991) (internal quotations and brackets omitted). Petitioner was aware of her right to testify at trial. To start, she knowingly and voluntarily waived her right to testify on the record. (Trial Tr. vol. VI, ECF No. 117 at 1264:14–1265:19.) In a colloquy with Judge Quarles, Petitioner said that her trial counsel had advised her of her rights and that she had "enough time to discuss" with her counsel whether she wanted to testify. (*Id.* at 1265:16–19.) In short, Petitioner "was clearly advised about [her] constitutional rights both to testify and not to testify, even though a trial court generally has no duty to inform a defendant of [her] right to testify." *United States v. Richardson*, 195 F.3d 192, 197 (4th Cir. 1999).

Other evidence supports the notion that Petitioner knew she had a right to testify. After all, Petitioner was an experienced attorney. And unrebutted correspondence from her counsel

---

[6] For the record, Petitioner's counsel disputes the factual basis of this claim. According to Petitioner's counsel, "[Petitioner] received every one of the Court's decisions in this case. The [Petitioner] was also present in court when Judge Quarles rendered the oral ruling at issue. In any event, [Petitioner] was an attorney admitted to practice in the U.S. District Court for the District of Maryland and thus had access to all of the rulings issued by Judge Quarles." (Tr. Att'y Aff., ECF No. 137 at ¶ 11.)

establishes that Petitioner was fully aware of her right to testify. For example, Petitioner and her counsel extensively discussed the pros and cons of her taking the stand. (ECF No. 139 at 82.) Because Petitioner allegedly performed poorly in mock cross-examinations, her counsel recommended that she not testify. (Tr. Att'y Aff., ECF No. 137 at ¶ 13.) In any event, Petitioner knew the final decision was hers to make. (ECF No. 139 at 82.) If Petitioner had decided to testify, her counsel was ready with an extensive outline for her direct examination. (*Id.* at 85–122.) That her counsel ultimately advised her not to testify does not constitute ineffective assistance of counsel. *See United States v. Adams*, 198 F.3d 238, 1999 WL 812352 at *1 (4th Cir. 1999) (unpublished table decision) ("An attorney's tactical decision in advising his client not to testify does not amount to ineffective assistance.") (citing *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983)).

The record conclusively shows Petitioner did not receive ineffective assistance based on her counsel's advice about whether she should testify. Accordingly, the Court will deny Petitioner relief on Grounds 6 and 21.

### 3. *Trial Preparation (Grounds 9, 13, 17)*

Petitioner claims her lawyers were unprepared for trial because they could not find certain documents during the proceedings. (Mot., ECF No. 124 at 22–23.) According to Petitioner, her counsel could locate only the first page of Mr. Strosnider's tax returns. The full tax returns revealed Mr. Strosnider suffered significant losses over multiple years.[7] Because BB&T approved Mr. Strosnider's loan despite these losses, Petitioner asserts the complete tax returns would have established BB&T's negligence in approving certain transactions.

---

[7] Similarly, Petitioner alleges her counsel failed to introduce Strosnider's credit report, which also would have shown why he was a risky candidate for a loan. (Mot., ECF No. 124 at 24.)

Petitioner also argues her lawyers were unprepared to cross-examine key witnesses. (Mot., ECF No. 124 at 27.) Before a BB&T loan officer took the stand, attorney Andrew White allegedly told co-counsel William Sinclair: "I do not know what is wrong with [co-counsel] Andrew [Norman], but he is really nervous. Will you take this witness?" (*Id.*) Mr. Sinclair allegedly declined to do so. Mr. Norman ultimately conducted the cross-examination. Separately, Petitioner contends her lawyers were not ready to cross-examine Jeff McCauley, the President of Susquehanna Bank. As proof, Petitioner notes her attorneys asked Mr. McCauley if Mr. VanSickle opened an account under the name of Unity Mortgage, when in fact VanSickle had used a different bank for the Unity Mortgage account.

Petitioner's allegations fail to entitle her to relief, even when viewed in a light most favorable to her. Bare and conclusory allegations that a lawyer failed to prepare for trial cannot establish ineffective assistance of counsel; specificity is necessary. *Bey v. United States*, No. CIV.A. RWT-11-3238, 2013 WL 715148, at *4 (D. Md. Feb. 25, 2013) (denying ineffective assistance of counsel claim where petitioner failed to specify how her attorney's failure to prepare for trial prejudiced her at trial). As for the allegedly lost tax returns, Petitioner cannot show how these documents, if admitted as evidence, would have prevented her conviction. *See Jones v. United States*, No. CR DKC 14-0176, 2018 WL 1069438, at *4 (D. Md. Feb. 27, 2018) (rejecting ineffective assistance of counsel claim where lawyers were alleged to have lost "crucial evidence" because the petitioner could not show the relevance of the misplaced evidence). Whether certain banks were negligent in approving certain transactions does not prove Petitioner's innocence. The Government introduced substantial evidence suggesting Petitioner knew she made false representations concerning the identity of the parties in interest. In any event, the jury convicted Petitioner despite testimony highlighting the negligence of the banks. (*See, e.g.*, Trial Tr. vol. II,

12

ECF No. 113 at 352:21–353:7, 363:3–18, 364:1–366:10.)   Accordingly, the absence of
Strosnider's tax returns did not prejudice Petitioner.

Petitioner's complaints about certain cross-examinations fare no better.  Neither incident
identified by Petitioner satisfies the prejudice standard of *Strickland*.  For example, Petitioner
simply asserts that she was prejudiced by Mr. Norman's alleged nervousness and Mr. Sinclair's
refusal to conduct a cross-examination.  But Petitioner has not explained how the actual cross-
examination was, in fact, ineffective or prejudicial.  The same problem plagues Petitioner's other
example in which she faults her attorneys for asking Mr. McCauley about the wrong bank account.
Petitioner has not explained what testimony from Mr. McCauley would have prevented her
conviction.[8]

### 4. *Jury Instructions (Ground 10)*

Petitioner next claims her counsel "failed to request a jury instruction to explain a Notary
Public's duties, and the criminal ramifications if the Notary Public fails in those duties." (Mot.,
ECF No. 124 at 25.)  Petitioner's claim is baseless.  As previously discussed, Petitioner's trial
counsel had a strategic reason to downplay the obligations and responsibilities of notary publics.
Arming the jury with instructions about the role of notaries could have raised questions about
Petitioner's non-compliance with her own obligations as a notary.  For example, Petitioner "did
not keep a log of the documents she notarized and she frequently did not ask for identifying

---

[8] Because Petitioner cannot show prejudice under *Strickland*, the Court need not address whether
Petitioner has adequately alleged a claim under *Strickland*'s "performance" prong.  For the record,
Petitioner's lawyers vigorously dispute the allegations concerning their preparedness for trial.
Petitioner's attorneys claim to have spent "hundreds of hours interviewing witnesses, reviewing
documents, and working closely" with Petitioner. (Tr. Att'y Aff., ECF No. 137 at ¶ 1.)  Allegedly,
Petitioner "personally reviewed the entire discovery produced by the Government both to save
costs and because she was intimately familiar with the materials." (*Id.*)  According to Petitioner's
counsel, any minor mistakes were insignificant, natural byproducts of a complex, two-week long
trial with approximately 20 witnesses. (*Id.* at ¶ 20.)

documents such as driver's licenses from persons whose papers she was notarizing." (Tr. Att'y Aff., ECF No. 137 at ¶¶ 7, 17.) Further, Petitioner does not explain why the lack of such a jury instruction resulted in her conviction. Accordingly, the Court will deny Petitioner relief on Ground 10.

### 5. Decisions About Fact Witnesses (Grounds 11, 15–16, 19–20, 23)

Petitioner also argues her lawyers failed to elicit certain testimony from various witnesses. First, Petitioner claims her counsel failed to highlight the fact that Jonathan Robeson, Petitioner's associate, conducted one of the real estate closings at issue. (Mot., ECF No. 124 at 25–26.) But the record reveals that decision was intentional and strategic. Had Petitioner told the jury she was not present for the closing, she "would be admitting that [Mr. Robeson]—at that point an inexperienced associate and [Petitioner's] employee—deliberately signed a false notary attesting that [Petitioner] w[as] present when in fact [she] w[as] not." (ECF No. 139 at 124.) That would have essentially told the jury "it was accepted practice in [Petitioner's] office to sign a false notary if convenient." (Id.) Petitioner and her counsel collectively discussed the issue "before and during trial," and "all agreed it was best as a matter of strategy not to make this clear for the jury." (Id.)

Petitioner's "consent [is] probative of the reasonableness of the chosen strategy and of trial counsel's performance." See Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995). In any event, "attorneys have great latitude on where they can focus the jury's attention and what . . . evidence they can choose not to introduce." Pruett v. Thompson, 996 F.2d 1560, 1571 n. 9 (4th Cir. 1993) (citing Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990)). The decision to minimize Mr. Robeson's role was purely strategic, which clearly "falls within the wide range of reasonable professional assistance." See Winston, 592 F.3d at 544.

14

Second, Petitioner claims her lawyers should have elicited testimony from other notary publics that notarized documents for VanSickle and Strosnider. (Mot., ECF No. 124 at 29–32.) Specifically, Petitioner faults her attorneys for declining to cross-examine Summer Rhodes Spiker, a notary who previously worked for Strosnider. On direct examination, Ms. Spiker testified that she notarized documents for Strosnider without verifying the identities or requiring the presence of the signatories. Petitioner contends her counsel should have "presented [Ms. Spiker] with the many documents she notarized and demanded an explanation for each document." (Mot., ECF No. 124 at 29.) Ms. Spiker's notarization of certain documents, according to Petitioner, gave the transactions an imprimatur of legitimacy. Additionally, Petitioner blames her attorneys for failing to call Wendy Herron, a notary public who notarized documents for VanSickle. (*Id.* at 31.) Petitioner argues her counsel should have used Ms. Spiker and Ms. Herron's notarizations as evidence that Petitioner "rel[ied] on other notaries to verify" the identity of signatories. (*Id.* at 32.) In other words, Petitioner suggests this additional testimony would have shown she lacked the requisite state of mind for her conviction.

Petitioner's claim concerning Ms. Spiker and Ms. Herron's testimony fails for familiar reasons. Again, decisions about which witnesses to call is a "classic tactical decision left to counsel." *See Chapman*, 593 F.3d at 369. Here, Petitioner's trial counsel declined to cross-examine Ms. Spiker for strategic reasons. Petitioner's counsel told Petitioner before trial that Ms. Spiker's testimony was not especially useful. (ECF No. 139 at 134.) The skepticism toward Ms. Spiker's utility became stronger during trial when Ms. Spiker seemed distraught and upset on the stand. (Trial Tr. vol. IV, ECF No. 115 at 780:14–23.) Ms. Spiker's direct testimony "amply showed that she improperly notarized documents presented to her by Strosnider and VanSickle." (Tr. Att'y Aff., ECF No. 137 ¶ 22.) Because Petitioner's lawyers were "concerned about [Ms.

15

Spiker] breaking down on cross examination and the same being held against [Petitioner]," they decided not to cross-examine her. (*Id.*)

Similarly, Petitioner's counsel had a strategic rationale for declining to put Ms. Herron on the stand. Petitioner's counsel located and hired a private investigator to interview Ms. Herron. (Tr. Att'y Aff., ECF No. 137 ¶ 22.) However, Petitioner's attorneys decided "it would be too risky to put Ms. Herron on the stand because her recollection of the events in question was understandably faulty due to the passage of time." (*Id.*) This decision, too, falls well within the boundaries of reasonable and effective assistance of counsel. *See Chapman*, 593 F.3d at 369; *see also Jones*, 2018 WL 1069438, at *3 (rejecting ineffective assistance of counsel claim where a lawyer declined to subpoena a "vital witness" to testify at trial).

Third, Petitioner claims her lawyers should have called Samuel VanSickle to testify. Petitioner does not so much as hint about what testimony from VanSickle would have exonerated her. Nonetheless, Petitioner's attorneys attempted to interview VanSickle. (Tr. Att'y Aff., ECF No. 137 ¶ 23.) Because VanSickle declined the interview, Petitioner's counsel had no idea what VanSickle would have said on the stand.[9] So, Petitioner's lawyers made the reasonable strategic decision not to call him as a witness. *See Chapman*, 593 F.3d at 369.

Finally, Petitioner lists a handful of other individuals who should have been called to testify as fact witnesses. These prospective witnesses range from other lawyers who assisted VanSickle to bank employees that issued cashier's checks to VanSickle. (Mot., ECF No. 124 at 38–39, 41–42.) Beyond simply listing these various individuals, Petitioner does not proffer any potential

---

[9] Petitioner suggests her lawyers should have at least introduced an apology letter VanSickle sent to Petitioner. (Mot., ECF No. 124 at 32–33.) Without VanSickle taking the stand, however, the letter constitutes inadmissible hearsay. A lawyer's decision not to introduce inadmissible evidence does not constitute ineffective assistance of counsel. *See Hoots v. Allsbrook*, 785 F.2d 1214, 1222 (4th Cir. 1986).

16

testimony that would have changed the outcome of the jury's verdict. The fact that *other people* may have unwittingly participated in VanSickle's scheme does not mean Petitioner was not privy to the conspiracy. Petitioner's inability to show prejudice under *Strickland* is dispositive. *See Jones*, 783 F.3d at 991.

In sum, the Court will deny Petitioner relief as to Grounds 11, 15, 16, 19, 20, and 23.

### 6. *Counsel's Courtroom Etiquette (Grounds 12, 22)*

Petitioner claims her lawyers made two unprofessional and prejudicial comments in front of the jury. First, Petitioner describes a conversation between two of her lawyers, Mr. White and Mr. Norman, during the Government's redirect of a witness. Mr. White allegedly told Mr. Norman, while the jury was present, that "if [Mr. Norman] did not get his act together, [Petitioner] was going to go to jail." (Mot., ECF No. 124 at 26.)

Second, Petitioner contends her lawyers "did not know how to effectively use the courtroom desktop projector." (*Id.* at 40.) While trying to display a document for the jury, Petitioner's counsel said, "I don't know how to work this thing very well." (Trial Tr. vol. IV, ECF No. 115 at 726:3.)

Neither incident warrants relief. In a two-week long trial, with dozens of witnesses and hundreds of exhibits, Petitioner isolates two comments made in passing by her lawyers. Petitioner's conclusory allegations of prejudice cannot satisfy *Strickland*. *Terry*, 366 F.3d at 316. In the first incident, no evidence suggests the jury even heard Mr. White's exact statement. While the record reflects the witness was distracted by some sort of conversation by Petitioner's counsel, Mr. White's alleged comment does not appear in the record. (Trial Tr. vol. II, ECF No. 113 at 726:3.) The second event has no relation to substantive issues in the case. Petitioner cannot plausibly claim the jury would not have convicted her if only she had a more tech savvy lawyer.

In sum, Petitioner has not alleged how either of these remarks were "but for" causes of Petitioner's conviction. *See Strickland*, 466 U.S. at 694. Accordingly, the Court will deny relief as to Grounds 12 and 22.

### 7. *Witness Sequestration, Post-Conviction Motions, and Discovery Issues (Ground 14)*

Petitioner next faults her lawyers for not requesting the Court sequester witnesses at the beginning of trial. (Mot., ECF No. 124 at 28.) But Petitioner points to only one witness who was present in the courtroom during other witnesses' testimony: FBI Special Agent Umlauf. Petitioner's lawyers did not object to Special Agent Umlauf's presence because the Federal Rules of Evidence expressly allow a case agent to be present during trial. *See* Fed. R. Evid. 615(b). So, the failure of Petitioner's lawyers to request a sequestration order does not constitute deficient performance. In any event, Petitioner has not explained how the result of trial would have been different if witnesses had been sequestered.

Petitioner also takes issue with her lawyers' failure to file post-conviction motions. (Mot., ECF No. 124 at 28.) Petitioner does not allege what sort of motion her counsel could or should have filed. Petitioner's lawyers have explained that "[n]o post-trial motions were filed because [Petitioner] did not ask [them] to do so, and obviously, [they] [could] not simply file such a motion of [their] own accord[.]" (Tr. Att'y Aff., ECF No. 137 at ¶ 21.) Further, "[Petitioner] essentially withdrew from communicating with [her lawyers] after the trial, and when she did so, it was to re-raise issues that had already been addressed and not to identify what could be done after the fact." (*Id.*) Ultimately, the Fourth Circuit affirmed Petitioner's verdict on all grounds. *See United States v. Blythe*, 654 F. App'x 618 (4th Cir. 2016). Petitioner is not entitled to relief based on her lack of post-conviction motions.

Petitioner also contends her lawyers failed to subpoena relevant real estate closing files from the banks at issue. However, the Government produced many of those files in discovery, so it is unclear how Petitioner was prejudiced. (Opp'n, ECF No. 140 at 27.)

In sum, the Court will deny Petitioner relief on Ground 14.

**8. *Evidentiary Decisions (Ground 18)***

Petitioner next argues her trial counsel "failed to explain to the jury why the defense presented more than 300 deeds to the court." (Mot., ECF No. 124 at 35.) Petitioner argues her lawyers "shoved in" too many documents "with little to no testimony or explanation." (*Id.*) The record disproves Petitioner's claim. In his closing argument, Petitioner's counsel explicitly explained the purpose of admitting the deeds as evidence. "The purpose of introducing documents from so many real property conveyances—over Government objection—was to show to the jury that the Defendant was justified in feeling comfortable in dealing with VanSickle and Strosnider and the entities the Government claimed were bogus because other prominent local attorneys were doing the same thing at the same time." (Tr. Att'y Aff., ECF No. 137 at ¶ 25.) Petitioner herself argues that highlighting other attorneys' participation in VanSickle's scheme was a necessary and appropriate defense strategy. (*See, e.g.*, Mot., ECF No. 124 at 35–36 ("VanSickle conducted business with more lawyers and companies than just Defendant. . . . [D]efense counsel could have argued Defendant was no different").)

Either way, introducing "too much" evidence does not generally constitute ineffective assistance of counsel. Attorneys "are permitted to set priorities, determine trial strategy, and press those claims with the greatest chances of success." *United States v. Mason*, 774 F.3d 824, 828 (4th Cir. 2014) (citing *Evans v. Thompson*, 881 F.2d 117, 124 (4th Cir. 1989)). Whether Petitioner's lawyers "should have placed a greater emphasis" on certain evidence is a strategy

question, which is committed to the sound discretion of trial counsel. *See Appiah v. United States*, No. CR GJH-15-508, 2020 WL 1808654, at \*4 (D. Md. Apr. 8, 2020). Further, Petitioner cannot show the result of the trial would have been different had the jury seen fewer deeds. Accordingly, the Court will deny relief as to Ground 18.

### 9.  *Pre-Sentence Investigation Report (Ground 25)*

Petitioner also contends she received a copy of the pre-sentence investigation report ("PSR") only two weeks before her sentencing date. She claims prejudice because the Federal Rules of Criminal Procedure require the probation officer to give the PSR to the defendant "at least 35 days before sentencing unless the defendant waives this minimum period." (Mot., ECF No. 124 at 43.)

Petitioner's complaint has little to do with her conviction. And Petitioner cannot claim the alleged delay prejudiced her at the sentencing phase. Although the U.S. Sentencing Guidelines called for a sentence between 46 months and 57 months (PSR, ECF No. 86 at 16), Judge Quarles imposed a 12 month prison sentence (Judgment, ECF No. 95). Petitioner has not explained how any of her counsel's conduct at the sentencing phase would entitle her to relief. Accordingly, the Court will deny Petitioner relief as to Ground 25.

### B.  *Prosecutorial Misconduct*

Finally, in addition to her various ineffective assistance claims, Petitioner raises a prosecutorial misconduct claim. (Mot., ECF No. 124 at 44.) But Petitioner failed to make any argument about prosecutorial misconduct on direct appeal, so her claim is procedurally defaulted. *See Jones*, 2018 WL 1069438, at \*4 (citing *Pruett v. Thompson*, 996 F.2d 1560, 1565 (4th Cir. 1993)) (finding a claim of prosecutorial misconduct procedurally defaulted because the petitioner had not raised the issue on direct review).

Even if the argument were not defaulted, Petitioner has not alleged any facts that would entitle her to relief. To establish prosecutorial misconduct, a petitioner must demonstrate (1) that the prosecution's conduct was "improper," and (2) that the improper conduct prejudicially affected her "substantial rights so as to deprive [her] of a fair trial." *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) (internal quotations omitted). Petitioner first alleges the Government failed to disclose whether the relevant banks still possessed the original loan files for each of the transactions. (Mot., ECF No. 124 at 44.) But the Government has repeatedly represented that all bank loan files that were obtained during the investigation were produced to Petitioner. Further, Petitioner fails to explain how her lack of access to these documents deprived her of a fair trial.

Petitioner next blames the Government for failing to correct various misstatements from witnesses. None rise to the level of depriving Petitioner of a fair trial. And some of Petitioner's claims simply mischaracterize the record. For example, Petitioner argues the Government "permitted Jeffrey McCauley to tell the judge and the jury Summer Rhodes was [the Petitioner's] employee." (Mot., ECF No. 124 at 45.) But Mr. McCauley immediately clarified that he, in fact, did not know whether Ms. Rhodes was Petitioner's employee. (Trial Tr. vol. II, ECF No. 113 at 293:23-25.)

Petitioner's remaining arguments essentially attempt to relitigate substantive issues from trial, each of which have already been adjudicated by both a jury of her peers and the United States Court of Appeals for the Fourth Circuit. *See Blythe*, 654 F. App'x at 618.

Accordingly, the Court will deny Petitioner relief as to her prosecutorial misconduct claim.

## IV.    *Conclusion*

For the reasons stated here, the Court shall issue an Order denying Petitioner's Motion to Vacate (ECF No. 124) and directing the Clerk to close this case.

DATED this ___19___ day of January, 2023.

BY THE COURT:

James K. Bredar
Chief Judge